<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-2003

                         UNITED STATES,

                           Appellee,

                               v.

                     JOSE R. SCHARON, JR.,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Juan M. Prez-Gimnez, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                   Cyr, Senior Circuit Judge,

               and Pollak, Senior District Judge.

                     _____________________

   Bryan M. Glover, by appointment of the Court, on brief, for
appellant.
   Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco,
Chief, Criminal Division, and Antonio R. Bazn, Assistant United
States Attorney, on brief, for appellee.

                      ____________________

                         June 17, 1999
                      ____________________

        TORRUELLA, Chief Judge.  On January 16, 1997, appellant
Jos R. Scharon, Jr. ("Scharon") arrived at Luis Muoz Marn
("LMM") Airport from Costa Rica.  Upon being referred to secondary
inspection by a Customs Inspector, his two suitcases were probed
because they had a strong smell of glue.  When searched, heroin was
found in the inner lining.  Additionally, a total of 563
counterfeit one hundred dollar bills were found bundled in
Scharon's jeans in the two suitcases.  Scharon was indicted for
violating 21 U.S.C.  841(a)(1) & 952(a) and 18 U.S.C.  472.
        At the first trial, the jury returned a guilty verdict on
all counts.  After the conclusion of the trial, Scharon filed a
"Motion for New Trial" based on the fact that prior to rendering a
verdict, one of the jurors had sent a note to the court stating
that it appeared from one of the exhibits, Scharon's driver's
license, that Scharon and the juror had the exact same home
address.  The court granted the motion and scheduled the case for
a second jury trial.
        At the second trial, Scharon was again convicted.  He was
sentenced to 144 months of imprisonment and a five-year term of
supervised release.  This appeal followed.
                           BACKGROUND
        Upon arrival at LMM Airport, Scharon submitted his
declaration form to the Customs Inspector and was referred for
secondary inspection.  In response to question (g) of the
declaration form, which requires that the traveler list all
countries visited prior to arrival in the United States, Scharon
listed only Panama.  Scharon's passport had a stamp with his date
of departure from Colombia on January 16, 1997.
        Customs Inspector Luis Gonzlez testified that on
January 16, 1997, he was working the secondary inspection table
when Scharon's flight arrived.  Scharon told Gonzlez that he was
coming from Panama and that he was a realtor.  After Gonzlez's
inspection of his passport, Scharon admitted having visited
Colombia, but denied carrying currency in excess of $10,000.  At
that time, Scharon's two suitcases were placed on the inspection
table.
        As soon as his luggage was opened, a strong smell of glue
was noticed and the contents were removed from the suitcases.  Both
suitcases were heavy even after the contents were removed.  They
were then punctured with a probe, and a white powdery substance was
detected.  A field test yielded positive results for heroin.  At
that time, Scharon was placed under arrest.
        Scharon then signed a "Warning and Waiver of Rights."  
Several identification documents were obtained from Scharon, as
well as 563 one hundred dollars bills which appeared "counterfeit"
to Inspector Gonzlez.
        At this point, Special Agent Carmen Ricci took custody of
the two suitcases.  Ricci advised Scharon of his constitutional
rights.  Scharon again waived his rights and proceeded to tell
Ricci that his original luggage had been damaged, but he did not
report it to the airline upon arrival in Colombia on December 9,
1996.  Scharon informed Ricci that he purchased the two seized
suitcases in Colombia to replace his damaged luggage, but did not
have a receipt or a business card to prove where he purchased them.  
Scharon informed her that while he was at the store where he
purchased the suitcases, a man approached him and told him that he
knew a woman who would wash, iron, and fold his clothing for him.  
Scharon accepted the offer.  According to Scharon, the woman was
supposed to take the suitcases from the store to his hotel room.  
He did not know the name of the woman, and said that while she
washed, ironed and was folding his clothes, he left to have lunch
with his girlfriend.
        Scharon did not change his clothes when he returned to
the hotel room.  When questioned again by Ricci as to whether he
had opened the suitcases, he stated: "Yes I did, I opened it up and
I put the toiletry bag in it."  However, he denied having smelled
a strong odor of glue.  Scharon stated that he left the damaged
suitcase in Colombia.
        Scharon took the stand in his own defense and testified
that he had five years of college education, but did not receive a
college diploma.  Since June of 1996, when he moved to Milwaukee,
he had worked with a firm dedicated to architectural lighting
consultations for a period of approximately two weeks.  During
September 1996, he traveled to Colombia because his brother had
suggested that he travel there to be interviewed by a friend of his
who worked for the airlines.
        That person's name was "Reginfo," and the job offer was
to take a prostitute to Japan.  He declined the offer for moral
reasons.  During this trip to Colombia, he became close to a female
named "Patricia" who happened to be the prostitute he was supposed
to take to Japan.  His involvement with "Patricia" motivated his
subsequent trips to Colombia.
        Scharon testified that the purpose of his trip to
Colombia on December 9, 1996 was to see "Patricia." He stayed at
the Astoria Hotel in Cali, Colombia.  On January 15, 1997, it was
"Patricia's" birthday, and late in the afternoon, they went
shopping.  He purchased the two suitcases, one small and one big,
and they arranged for the suitcases to be delivered to his hotel
room.  He never met the woman who was supposed to take the
suitcases to his hotel room.  According to Scharon, he just called
the hotel, and told them to expect the woman who would attend to
his clothes and pack his things.
        He returned to his hotel room late that evening, and then
took a bus to Medelln to get his return flight.  He stated that he
did not smell any odor from the suitcase when he packed his
toiletry bag before leaving the hotel.
        On cross-examination, Scharon admitted that from June 22,
1996, for two months, both he and his family had been receiving
food stamps.  He admitted that he traveled to Colombia on
October 18th, and at the time, was receiving all his money from
"Patricia."  He remained in Colombia until November.  In November,
still with no source of income, he traveled twice to Colombia.  
"Patricia" provided the funding for his travel to Colombia and
during his stay in the country.  She was employed at a warehouse
during the day, but also engaged in prostitution.  For the December
trip, "Patricia" gave him $1000, part of which he used to pay for
the airline ticket.  "Patricia" also paid for his hotel expenses.  
The suitcases were purchased separately, with money from an
unidentified source.
        Experts testified that inside the interior sidewalls of
the suitcases were approximately 2.4 kilograms of heroin.  Cartoon
paper had been placed on the interior walls to prevent x-ray
detection.  Further, the sidewalls of the suitcases had to be
broken with a hammer because they were made of fiberglass.  
Evidence was also introduced establishing that the 563 one hundred
dollar bills found in Scharon's packed jeans were counterfeit.
                           DISCUSSION
I.  Sufficiency of the Evidence
        One who challenges the sufficiency of the evidence bears
a heavy burden: he must show that no rational jury could have found
him guilty beyond a reasonable doubt.  See United States v.
Rodrguez, 162 F.3d 135, 141 (1st Cir. 1998).  We review the
sufficiency of the evidence as a whole, in a light most favorable
to the verdict, taking into consideration all reasonable
inferences.  See  United States v. Scantleberry-Frank, 158 F.3d
612, 616 (1st Cir. 1998).  We resolve all credibility issues in
favor of the verdict.  See id.  The evidence may be entirely
circumstantial, and need not exclude every hypothesis of innocence;
that is, the factfinder may decide among reasonable interpretations
of the evidence.  See id. (citation omitted).
        First, Scharon arrived at LMM Airport on board L.A.C.S.A.
Flight 653.  He had originally purchased a C.O.P.A. Airlines ticket
to San Juan in Colombia.  Upon arrival in Panama, he exchanged the
Panama to Puerto Rico portion of the airline ticket for a
L.A.C.S.A. airline ticket.  His Customs Declaration card reflected
that he was arriving in San Juan from Panama rather than from
Colombia, a source country for narcotics.  A reasonable inference
can be made that he did not want Customs to know that his trip had
originated in Colombia.
        Second, witnesses testified that a strong smell of glue
emanated from Scharon's suitcases when opened.  Yet, Scharon denied
having detected this glue smell even though he admitted opening at
least the smaller of the suitcases to pack his toiletry bag.  The
jury could have easily inferred that Scharon's denial was a
fabrication to disguise his knowledge that narcotics were secreted
in the suitcases.
        Third, the jury could have found Scharon's description of
the events not to be credible.  He testified that on the last day
of his trip, he went to a store, whose name he cannot recall, to
purchase two suitcases that had been damaged at the beginning of
the trip.  He did not have a receipt for the purchase of the
suitcases or any indicia identifying the store.  He permitted a
woman, whose name he did not know, to enter his hotel room to wash,
iron, and pack his clothes in the new suitcases.
        Moreover, Scharon did not have any means of support,
aside from his Colombian girlfriend "Patricia," who was a
prostitute.  Yet, he had a return airline ticket to Colombia for
the month of February 1997, and within the pockets of his packed
jeans was over $50,000 in counterfeit United States currency.
        The above evidence, along with his suitcases containing  
heroin with a street value of over $2 million dollars, was
sufficient for the jury, employing its common sense in evaluating
the circumstantial evidence, to conclude beyond a reasonable doubt
that Scharon knew the suitcases contained heroin.  See United
States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992) ("[N]o premium
is placed upon direct as opposed to circumstantial evidence; both
types of proof can adequately ground a conviction.").
II.  Chain of Custody
        Scharon argues that the district court abused its
discretion in admitting the narcotics at trial because it could not
have determined with reasonable probability that the evidence had
not been altered in any material respect given an alleged break in
the chain of custody.  Because no objection was made at trial, we
review only for plain error.  See Johnson v. United States, 520
U.S. 461, 467 (1997).
        A possible defect in the chain of custody for a certain
piece of evidence factors into the weight given to the evidence
rather than its admissibility.  See Rodrguez, 162 F.3d at 144.  A
defendant can attempt to cast doubt on an exhibit's authenticity.  
See id.  Such an issue, however, is to be resolved by the jury, and
not the judge.  See id.
        The narcotics were properly authenticated and introduced
into evidence.  At trial, the government showed that the suitcases
were the suitcases seized from Scharon at LMM Airport, and the
suitcases from which the forensic chemist extracted the narcotics
at the laboratory.  Under Fed. R. Evid.  901, the government
satisfied its authentication requirement for the seized narcotics.
III.  "Safety Valve"
        Scharon argues that the district court erred in finding
that he failed to meet the five criteria listed in the "safety
valve" provision for relief from mandatory minimum sentences.  See
18 U.S.C.  3553(f)(1)-(5); U.S.S.G.  5C1.2.  That provision, if
applicable, requires a sentencing court to disregard the
statutorily imposed mandatory minimum sentence and impose sentence
pursuant to the Sentencing Guidelines.  See 18 U.S.C. S 3553(f).  
The government concedes that Scharon met the first four of the
criteria.  See 18 U.S.C.  3553(f)(1)-(4).  In dispute is the fifth
criterion, which requires a defendant to "truthfully provide[] to
the Government all information and evidence the defendant has"
regarding the offense.  18 U.S.C.  3553(f)(5).
        In order to qualify for safety valve relief, the
defendant must persuade the court that he meets all of the
requirements.  See United States v. Montaez, 82 F.3d 520, 523 (1st
Cir. 1996).  We review for clear error the district court's factual
determinations underlying the question whether a defendant is
entitled to such relief.  See United States v. Miranda-Santiago, 96
F.3d 517, 527 (1st Cir. 1996).  "Where there is more than one
plausible view of the circumstances, the sentencing court's choice
among supportable alternatives cannot be clearly erroneous."  
United States v. D'Andrea, 107 F.3d 949, 958 (1st Cir. 1997).
        Previously, we have found clear error in the denial of
safety valve relief where "the government did not rebut
[defendant's] facially plausible tale of limited involvement by
pointing to information [the] defendant must have known."  
Miranda-Santiago, 96 F.3d at 529.  Thus, a sentencing court's "bare
conclusion" that the defendant failed to cooperate within the
meaning of  3553(f)(5) is insufficient to support such a finding
"absent either specific factual findings or easily recognizable
support in the record." Id.
        In finding that Scharon failed to meet the fifth
criterion, the district court stated:
                 I find for various reasons, one, it states in
        the pre-sentence report which was prepared in
        March concerning defendant's acceptance of
        responsibility, Mr. Scharon proclaimed his
        innocence and provided no personal statement.  
        That is what the pre-sentence [sic] claims and
        has not been taken in issue by counsel or the
        defendant at this sentencing hearing.

                    Secondly, defendant went to trial, he took
        the stand and consistent with what the pre-
        sentence report states, he gave his version of
        the facts for which he portrayed for the jury,
        that he did not know anything about the drugs
        nor the counterfeit monies that were coming
        there so the criteria the Court finds are
        based on these two grounds; that he did not
        comply with the criteria . . . and, therefore,
        the Court will not grant him the benefit of
        the safety valve.
        Scharon argues that he satisfied the burden for the fifth
criterion because he truthfully provided all the information he had
concerning the offense at a debriefing on July 8, 1998 with the
government.  In response, the government states that the object of
the debriefing was to obtain a "Plea and Cooperation Agreement" so
that other persons could be prosecuted in relation to those
offenses.  Such cooperation did not materialize because Scharon
decided to exculpate himself and deny knowledge of the narcotics
concealed in his suitcases and the counterfeit currency found in
his jeans.  According to the government, he elected to go to trial.
        In determining the amount of information a convicted
defendant must provide to the government in order to meet the fifth
criterion and avail himself of the safety valve provision, we note
that other circuits have held that a defendant must disclose
information beyond the offense of conviction to satisfy the safety
valve.  See United States v. Gambino, 106 F.3d 1105, 1111 (2d Cir.
1997) (rejecting defendant's argument that he did not have to
answer questions beyond the conspiracy period alleged and to which
he pled guilty); United States v. Adu, 82 F.3d 119, 124 (6th Cir.
1996) (stating that the safety valve provisions "clearly require an
affirmative act by the defendant truthfully disclosing all the
information he possesses that concerns his offense and related
offenses" and upholding district court's refusal to apply the
safety valve where the defendant did not provide complete
information concerning other offenses); United States v. Long, 77
F.3d 1060, 1062-63 (8th Cir.) (district court did not err in
refusing to apply safety valve where defendant did not truthfully
provide all information relevant to the "same course of conduct or
. . . a common scheme or plan" of drug trafficking); see also
United States v. Arrington, 73 F.3d 144, 149 (7th Cir. 1996)
(stating that  3553(f) requires a defendant to disclose "'all
information' concerning the course of conduct -- not simply the
facts that form the basis for the criminal charge").
        The district court had the opportunity to hear Scharon's
testimony at trial and gauge his credibility.  As the above
quotation from the sentencing transcript illustrates, the district
court was not persuaded that Scharon was truthful during his
testimony.  It simply strains the limits of credibility to believe
that forces in Colombia, absolutely oblivious to Scharon's final
destination, would go to enormous effort to secrete well over $2
million dollars worth of heroin in his suitcases and further insert
over $50,000 in counterfeit currency in his jeans pockets.   
        The district court did not clearly err in determining
that Scharon did not satisfy the requirement that he provide "all
information and evidence [he] has concerning the offense."  18
U.S.C.  3553(f)(5).  At the very least, Scharon should have
disclosed the identity of the person on whose behalf he was acting.  
See United States v. Buffington, 879 F. Supp. 1220, 1223 (N.D. Ga.
1995).
                           CONCLUSION
        For the reasons stated above, we AFFIRM the judgment of
the district court.

</body>

</html>