**UNITED STATES, Appellee,**

v.

**Jose R. SCHARON, Jr., Defendant, Appellant.**

**No. 98–2003.**

United States Court of Appeals, First Circuit.

Heard May 10, 1999.

Decided June 17, 1999.

Bryan M. Glover, by appointment of the Court, on brief, for appellant.

Guillermo Gil, United States Attorney, Jorge E. Vega–Pacheco, Chief, Criminal Division, and Antonio R. Bazán, Assistant United States Attorney, on brief, for appellee.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and POLLAK,\* Senior District Judge.

TORRUELLA, Chief Judge.

On January 16, 1997, appellant José R. Scharon, Jr. ("Scharon") arrived at Luis Muñoz Marín ("LMM") Airport from Costa Rica. Upon being referred to secondary inspection by a Customs Inspector, his two suitcases were probed because they had a strong smell of glue. When searched, heroin was found in the inner lining. Additionally, a total of 563 counterfeit one hundred dollar bills were found bundled in Scharon's jeans in the two suitcases. Scharon was indicted for violating 21 U.S.C. §§ 841(a)(1) & 952(a) and 18 U.S.C. § 472.

At the first trial, the jury returned a guilty verdict on all counts. After the conclusion of the trial, Scharon filed a "Motion for New Trial" based on the fact that prior to rendering a verdict, one of the jurors had sent a note to the court stating that it appeared from one of the exhibits, Scharon's driver's license, that Scharon and the juror had the exact same home address. The court granted the motion and scheduled the case for a second jury trial.

At the second trial, Scharon was again convicted. He was sentenced to 144 months of imprisonment and a five-year term of supervised release. This appeal followed.

## BACKGROUND

Upon arrival at LMM Airport, Scharon submitted his declaration form to the Customs Inspector and was referred for secondary inspection. In response to ques-

---

\* Of the Eastern District of Pennsylvania, sitting by designation.

tion (g) of the declaration form, which requires that the traveler list all countries visited prior to arrival in the United States, Scharon listed only Panama. Scharon's passport had a stamp with his date of departure from Colombia on January 16, 1997.

Customs Inspector Luis González testified that on January 16, 1997, he was working the secondary inspection table when Scharon's flight arrived. Scharon told González that he was coming from Panama and that he was a realtor. After González's inspection of his passport, Scharon admitted having visited Colombia, but denied carrying currency in excess of $10,000. At that time, Scharon's two suitcases were placed on the inspection table.

As soon as his luggage was opened, a strong smell of glue was noticed and the contents were removed from the suitcases. Both suitcases were heavy even after the contents were removed. They were then punctured with a probe, and a white powdery substance was detected. A field test yielded positive results for heroin. At that time, Scharon was placed under arrest.

Scharon then signed a "Warning and Waiver of Rights." Several identification documents were obtained from Scharon, as well as 563 one hundred dollars bills which appeared "counterfeit" to Inspector González.

At this point, Special Agent Carmen Ricci took custody of the two suitcases. Ricci advised Scharon of his constitutional rights. Scharon again waived his rights and proceeded to tell Ricci that his original luggage had been damaged, but he did not report it to the airline upon arrival in Colombia on December 9, 1996. Scharon informed Ricci that he purchased the two seized suitcases in Colombia to replace his damaged luggage, but did not have a receipt or a business card to prove where he purchased them. Scharon informed her that while he was at the store where he purchased the suitcases, a man approached him and told him that he knew a woman who would wash, iron, and fold his clothing

for him. Scharon accepted the offer. According to Scharon, the woman was supposed to take the suitcases from the store to his hotel room. He did not know the name of the woman, and said that while she washed, ironed and was folding his clothes, he left to have lunch with his girlfriend.

Scharon did not change his clothes when he returned to the hotel room. When questioned again by Ricci as to whether he had opened the suitcases, he stated: "Yes I did, I opened it up and I put the toiletry bag in it." However, he denied having smelled a strong odor of glue. Scharon stated that he left the damaged suitcase in Colombia.

Scharon took the stand in his own defense and testified that he had five years of college education, but did not receive a college diploma. Since June of 1996, when he moved to Milwaukee, he had worked with a firm dedicated to architectural lighting consultations for a period of approximately two weeks. During September 1996, he traveled to Colombia because his brother had suggested that he travel there to be interviewed by a friend of his who worked for the airlines.

That person's name was "Reginfo," and the job offer was to take a prostitute to Japan. He declined the offer for moral reasons. During this trip to Colombia, he became close to a female named "Patricia" who happened to be the prostitute he was supposed to take to Japan. His involvement with "Patricia" motivated his subsequent trips to Colombia.

Scharon testified that the purpose of his trip to Colombia on December 9, 1996 was to see "Patricia." He stayed at the Astoria Hotel in Cali, Colombia. On January 15, 1997, it was "Patricia's" birthday, and late in the afternoon, they went shopping. He purchased the two suitcases, one small and one big, and they arranged for the suitcases to be delivered to his hotel room. He never met the woman who was supposed to take the suitcases to his hotel

room. According to Scharon, he just called the hotel, and told them to expect the woman who would attend to his clothes and pack his things.

He returned to his hotel room late that evening, and then took a bus to Medellín to get his return flight. He stated that he did not smell any odor from the suitcase when he packed his toiletry bag before leaving the hotel.

On cross-examination, Scharon admitted that from June 22, 1996, for two months, both he and his family had been receiving food stamps. He admitted that he traveled to Colombia on October 18th, and at the time, was receiving all his money from "Patricia." He remained in Colombia until November. In November, still with no source of income, he traveled twice to Colombia. "Patricia" provided the funding for his travel to Colombia and during his stay in the country. She was employed at a warehouse during the day, but also engaged in prostitution. For the December trip, "Patricia" gave him $1000, part of which he used to pay for the airline ticket. "Patricia" also paid for his hotel expenses. The suitcases were purchased separately, with money from an unidentified source.

Experts testified that inside the interior sidewalls of the suitcases were approximately 2.4 kilograms of heroin. Cartoon paper had been placed on the interior walls to prevent x-ray detection. Further, the sidewalls of the suitcases had to be broken with a hammer because they were made of fiberglass. Evidence was also introduced establishing that the 563 one hundred dollar bills found in Scharon's packed jeans were counterfeit.

## DISCUSSION

### I. Sufficiency of the Evidence

■ One who challenges the sufficiency of the evidence bears a heavy burden: he must show that no rational jury could have found him guilty beyond a reasonable doubt. *See United States v. Rodríguez*, 162 F.3d 135, 141 (1st Cir.1998). We re-

view the sufficiency of the evidence as a whole, in a light most favorable to the verdict, taking into consideration all reasonable inferences. *See United States v. Scantleberry–Frank*, 158 F.3d 612, 616 (1st Cir.1998). We resolve all credibility issues in favor of the verdict. *See id.* The evidence may be entirely circumstantial, and need not exclude every hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence. *See id.* (citation omitted).

First, Scharon arrived at LMM Airport on board L.A.C.S.A. Flight 653. He had originally purchased a C.O.P.A. Airlines ticket to San Juan in Colombia. Upon arrival in Panama, he exchanged the Panama to Puerto Rico portion of the airline ticket for a L.A.C.S.A. airline ticket. His Customs Declaration card reflected that he was arriving in San Juan from Panama rather than from Colombia, a source country for narcotics. A reasonable inference can be made that he did not want Customs to know that his trip had originated in Colombia.

Second, witnesses testified that a strong smell of glue emanated from Scharon's suitcases when opened. Yet, Scharon denied having detected this glue smell even though he admitted opening at least the smaller of the suitcases to pack his toiletry bag. The jury could have easily inferred that Scharon's denial was a fabrication to disguise his knowledge that narcotics were secreted in the suitcases.

Third, the jury could have found Scharon's description of the events not to be credible. He testified that on the last day of his trip, he went to a store, whose name he cannot recall, to purchase two suitcases to replace one that had been damaged at the beginning of the trip. He did not have a receipt for the purchase of the suitcases or any indicia identifying the store. He permitted a woman, whose name he did not know, to enter his hotel room to wash, iron, and pack his clothes in the new suitcases.

Moreover, Scharon did not have any means of support, aside from his Colombian girlfriend "Patricia," who was a prostitute. Yet, he had a return airline ticket to Colombia for the month of February 1997, and within the pockets of his packed jeans was over $50,000 in counterfeit United States currency.

The above evidence, along with his suitcases containing heroin with a street value of over $2 million dollars, was sufficient for the jury, employing its common sense in evaluating the circumstantial evidence, to conclude beyond a reasonable doubt that Scharon knew the suitcases contained heroin. *See United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992) ("[N]o premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction.").

## II. Chain of Custody

■ Scharon argues that the district court abused its discretion in admitting the narcotics at trial because it could not have determined with reasonable probability that the evidence had not been altered in any material respect given an alleged break in the chain of custody. Because no objection was made at trial, we review only for plain error. *See Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

■ A possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility. *See Rodríguez*, 162 F.3d at 144. A defendant can attempt to cast doubt on an exhibit's authenticity. *See id.* Such an issue, however, is to be resolved by the jury, and not the judge. *See id.*

The narcotics were properly authenticated and introduced into evidence. At trial, the government showed that the suitcases were the suitcases seized from Scharon at LMM Airport, and the suitcases from which the forensic chemist extracted the narcotics at the laboratory. Under Fed. R.Evid. 901, the government satisfied its authentication requirement for the seized narcotics.

## III. "Safety Valve"

■ Scharon argues that the district court erred in finding that he failed to meet the five criteria listed in the "safety valve" provision for relief from mandatory minimum sentences. *See* 18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. § 5C1.2. That provision, if applicable, requires a sentencing court to disregard the statutorily imposed mandatory minimum sentence and impose sentence pursuant to the Sentencing Guidelines. *See* 18 U.S.C. § 3553(f). The government concedes that Scharon met the first four of the criteria. *See* 18 U.S.C. § 3553(f)(1)-(4). In dispute is the fifth criterion, which requires a defendant to "truthfully provide[ ] to the Government all information and evidence the defendant has" regarding the offense. 18 U.S.C. § 3553(f)(5).[1]

■ In order to qualify for safety valve relief, the defendant must persuade the court that he meets all of the requirements. *See United States v. Montañez*, 82 F.3d 520, 523 (1st Cir.1996). We review for clear error the district court's factual determinations underlying the question whether a defendant is entitled to such relief. *See United States v. Miranda-Santiago*, 96 F.3d 517, 527 (1st Cir.1996). "Where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alterna-

---

1. In full, the fifth criterion requires that not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but

the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
18 U.S.C. § 3553(f)(5).

tives cannot be clearly erroneous." *United States v. D'Andrea*, 107 F.3d 949, 958 (1st Cir.1997).

█ Previously, we have found clear error in the denial of safety valve relief where "the government did not rebut [defendant's] facially plausible tale of limited involvement by pointing to information [the] defendant must have known." *Miranda–Santiago*, 96 F.3d at 529. Thus, a sentencing court's "bare conclusion" that the defendant failed to cooperate within the meaning of § 3553(f)(5) is insufficient to support such a finding "absent either specific factual findings or easily recognizable support in the record." *Id.*

In finding that Scharon failed to meet the fifth criterion, the district court stated:

I find for various reasons, one, it states in the pre-sentence report which was prepared in March concerning defendant's acceptance of responsibility, Mr. Scharon proclaimed his innocence and provided no personal statement. That is what the pre-sentence [sic] claims and has not been taken in issue by counsel or the defendant at this sentencing hearing.

Secondly, defendant went to trial, he took the stand and consistent with what the pre-sentence report states, he gave his version of the facts for which he portrayed for the jury, that he did not know anything about the drugs nor the counterfeit monies that were coming there so the criteria the Court finds are based on these two grounds; that he did not comply with the criteria ... and, therefore, the Court will not grant him the benefit of the safety valve.

Scharon argues that he satisfied the burden for the fifth criterion because he truthfully provided all the information he had concerning the offense at a debriefing on July 8, 1998 with the government. In response, the government states that the object of the debriefing was to obtain a "Plea and Cooperation Agreement" so that other persons could be prosecuted in rela-

tion to those offenses. Such cooperation did not materialize because Scharon decided to exculpate himself and deny knowledge of the narcotics concealed in his suitcases and the counterfeit currency found in his jeans. According to the government, he elected to go to trial.

In determining the amount of information a convicted defendant must provide to the government in order to meet the fifth criterion and avail himself of the safety valve provision, we note that other circuits have held that a defendant must disclose information beyond the offense of conviction to satisfy the safety valve. *See United States v. Gambino*, 106 F.3d 1105, 1111 (2d Cir.1997) (rejecting defendant's argument that he did not have to answer questions beyond the conspiracy period alleged and to which he pled guilty); *United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996) (stating that the safety valve provisions "clearly require an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense and related offenses" and upholding district court's refusal to apply the safety valve where the defendant did not provide complete information concerning other offenses); *United States v. Long*, 77 F.3d 1060, 1062–63 (8th Cir.) (district court did not err in refusing to apply safety valve where defendant did not truthfully provide all information relevant to the "same course of conduct or ... a common scheme or plan" of drug trafficking); *see also United States v. Arrington*, 73 F.3d 144, 149 (7th Cir.1996) (stating that § 3553(f) requires a defendant to disclose " 'all information' concerning the course of conduct—not simply the facts that form the basis for the criminal charge").

The district court had the opportunity to hear Scharon's testimony at trial and gauge his credibility. As the above quotation from the sentencing transcript illustrates, the district court was not persuaded that Scharon was truthful during his testimony. It simply strains the limits of credibility to believe that forces in Colom-

bia, absolutely oblivious to Scharon's final destination, would go to enormous effort to secrete well over $2 million dollars worth of heroin in his suitcases and further insert over $50,000 in counterfeit currency in his jeans pockets.

The district court did not clearly err in determining that Scharon did not satisfy the requirement that he provide "all information and evidence [he] has concerning the offense." 18 U.S.C. § 3553(f)(5). At the very least, Scharon should have disclosed the identity of the person on whose behalf he was acting. *See United States v. Buffington*, 879 F.Supp. 1220, 1223 (N.D.Ga.1995).

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.