**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ana Cecilia RAMIREZ, Defendant–Appellant.**

**No. 01–1259.**

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 7, 2001.

Decided Sept. 6, 2001.

Before COFFEY, KANNE, and WILLIAMS, Circuit Judges.

### ORDER

Ana Ramirez appeals from her 120–month sentence for conspiracy to possess with intent to distribute, and possession with intent to distribute, approximately 1.7 kilograms of heroin. *See* 21 U.S.C. §§ 846, 841(a)(1). Ramirez argues that the district court clearly erred in finding her ineligible for the safety valve provision of U.S.S.G. § 5C1.2. If applied, § 5C1.2 would have required the court to ignore the mandatory minimum statutory sentence of 120 months and instead to sentence Ramirez in a guideline range of 87 to 108 months. We affirm.

### Background

In April 2000 the Drug Enforcement Administration ("DEA"), with the assistance of co-defendant Santiago Rodriguez, arranged a controlled delivery of approximately 1.7 kilograms of heroin at the Edgebrook Motel in Chicago. Rodriguez had informed law enforcement that he was supposed to call a drug dealer, Gustavo, for delivery instructions when he got to the motel. When Rodriguez called Gustavo, Gustavo instructed him to call "Cecilia" at 312–933–1488 to complete the heroin deal. When Rodriguez called the number Ramirez answered. Rodriguez mistakenly asked for "Gutti," a nickname for Gustavo, and Ramirez responded that Gutti was not there and hung up. Rodriguez called back and explained that Gutti had given him her number and had told him to ask for Cecilia. Rodriguez told Ramirez that he had "receipts" that needed to be picked up at the Edgebrook Motel, and Ramirez agreed to come to the motel.

About an hour later Ramirez and Desaree Morciglio arrived at the motel, and Rodriguez gave Ramirez the heroin pellets. Ramirez counted the pellets because, she told Rodriguez.

> It happened to me with another guy.... Because this already happened to me. Imagine, that a guy handed me–there were one hundred and fifty and he handed me one hundred and forty and I had to pay for that. All for not counting everything.

Ramirez then put the heroin in her purse and attempted to leave the motel. DEA agents arrested Ramirez and recovered the heroin, as well as two cell phones, one assigned the number 312–933–1488 (the number Gustavo provided Rodriguez and hereafter referred to as the "drug phone") and the other 773–368–4320.

After her arrest, Ramirez agreed to be interviewed. She told DEA agents that she arrived in Miami. Florida, from Bogota, Columbia, in March 2000. Ramirez said that she became involved in drug trafficking through a Cuban male she met in Miami, who told her that she could make money if she went to Chicago to transport drugs and cash. The Cuban male directed her to buy a cell phone and to give him the number when she got to Chicago. Ramirez said that she then traveled to Chicago where she arranged for an unknown man to buy her a cell phone. She said that any time the cell phone rang, she knew that she had a job to pick up drugs or money, and that when she went to the Edgebrook Motel she knew she was going there to pick up drugs. Ramirez also claimed to have met Desaree Morciglio in a nightclub after she arrived in Chicago. At the end of the interview, Ramirez consented to a search of her apartment, where DEA agents found $2,384.00.

In June and July 2000, Ramirez and her attorney met with government representatives to participate in "safety valve" interviews to determine her eligibility for a sentence reduction under U.S.S.G.

§ 5C1.2. During the interviews the government asked Ramirez how she became involved in drug trafficking. Ramirez explained that she met a Cuban male, Juan Carlos, at a nightclub in Miami and agreed to do "favors" for him in exchange for money. Ramirez claimed that she left Miami for New York to work as a dancer, but after a week she left for Chicago because she could make more money there working for Carlos. The government also asked about Ramirez's association with Morciglio. Ramirez said that she had known Morciglio since 1998, and that Morciglio had helped her rent an apartment, buy a car, and buy the drug phone after she got to Chicago. When the government asked about Ramirez's statement to Rodriguez that she was counting the heroin pellets because she had come up short before, Ramirez responded that she had been talking about an occasion when "Wilson" met her at a gas station on Carlos's behalf and gave her money to deliver to "Claudia." Ramirez said that both Wilson and Claudia later told her that some of the money was missing and that she was responsible for it. Ramirez claimed that she did not receive instructions from anyone about the heroin pick-up at the Edgebrook Motel, and that she had never been paid for any of her drug-related activities. She claimed to have earned the $2,384.00 found in her apartment working as a dancer.

In August 2000 Ramirez entered guilty pleas to conspiracy to distribute, and possession with intent to distribute, heroin, after which the district court commenced her sentencing hearing. The only contested issue was whether Ramirez qualified for a safety valve reduction. The government contended that Ramirez had not truthfully disclosed all of the information she possessed related to her drug trafficking activities. In the first segment of the sentencing hearing, the court inquired about a number of issues, including in particular the gas-station transfer of money from Wilson to Claudia and Ramirez's two cell phones. When Ramirez explained the gas-station transfer, she told the court she received money from "William" instead of "Wilson." As for the phones, Ramirez told the court that one of them was for use in drug trafficking and one was for personal use. The court asked the government to subpoena the phone records in order to corroborate or dispel parts of Ramirez's version of events, and continued the sentencing hearing until December 2000. When the sentencing hearing resumed, the district court suggested that Ramirez participate in another safety valve interview about the subpoenaed phone records in the hope that she would recall additional information. Ramirez agreed, and the court again recessed the sentencing hearing.

In January 2001 Ramirez and her attorney met with the government for a third safety valve interview. The government showed Ramirez the drug phone records, and asked whether any of the calls listed related to drug trafficking. Ramirez responded that none did. The government again asked Ramirez why she had two cell phones. This time she responded that she needed two phones because she was running out of minutes on one of her phones, and that the purchase of a second phone had nothing to do with drug trafficking. The government also asked about specific numbers listed in the records, including an unlisted Philadelphia number, 215–288–6258. Ramirez claimed the number belonged to a girlfriend who was a dancer. The DEA later determined that the number was provided to law enforcement by Ramon Ruiz–Rosado when he was arrested in June 2000 in New York on money laundering and cocaine charges.

In January 2001 the court resumed the sentencing hearing, and found that Ramirez had not proved by a preponderance

of the evidence that she qualified for the safety valve reduction. The court reasoned that the "inconsistencies" in her statements "belied common sense," and concluded that Ramirez was "not truthful with regard to the knowledge she had as to the activities of the criminal conduct of which she was aware but not personally involved in." The court sentenced Ramirez to the mandatory minimum statutory sentence of 120 months' imprisonment, to be followed by five years' supervised release.

### Analysis

We review a district court's determination that a defendant is ineligible to receive a reduction under § 5C1.2 for clear error. *United States v. Grimm*, 170 F.3d 760, 768 (7th Cir.1999). A defendant who meets the requirements of the § 5C1.2 safety valve must be sentenced in accordance with the sentencing guidelines, and is exempt from any otherwise applicable statutory minimum sentence. *United States v. Brack*, 188 F.3d 748, 762 (7th Cir.1999). To qualify for the safety valve, a defendant must satisfy five criteria. Only one of the criteria is at issue here–whether Ramirez truthfully provided all of the information she had concerning her offense or offenses that were part of the same course of conduct. *See* U.S.S.G. § 5C1.2(5).

### I. The Scope Of The Safety Valve Disclosure Requirement.

Ramirez principally contends that the scope of her third safety valve interview about the phone records was too broad, and that the district court improperly considered her statements as to "noncharged" conduct. This argument is frivolous. First, Ramirez waived her objection to being questioned about the phone records when she consented to the interview knowing what the subject matter would be. *See United States v. Staples*, 202 F.3d 992, 995 (7th Cir.2000) (defendant waived right to appeal criminal history calculation by failing to object to the PSR despite advance notice of its contents); *United States v. Long*, 77 F.3d 1060, 1063 (8th Cir.1996) ("We also think that if such questioning [in the safety valve interview] was beyond the scope of the relevant criminal conduct, it was incumbent upon the defendant or defense counsel to object to the question.").

More significantly, Ramirez's assertion that the calls reflected in the phone records were unrelated to her offenses is belied by the record. Ramirez purchased the cell phone specifically to use in drug trafficking. She admitted that when her drug phone rang, she knew she had to pick up drugs or drug money. The cell phone number is the same one that Gustavo gave to Rodriguez (and that Ramirez answered more than once) to arrange the heroin pick-up at the Edgebrook Motel. The government thus was well within its rights to question Ramirez about the calls she made and received on her cell phone. *See United States v. Arrington*, 73 F.3d 144, 148 (7th Cir.1996) ("the court may reasonably require a defendant to reveal information regarding his chain of distribution").

Regardless, it matters not whether the government's questions went beyond "noncharged" conduct because to qualify for the safety valve a defendant must go beyond the charged conduct and provide all of the information she has about the relevant conduct of others as well. *See Arrington*, 73 F.3d at 149; *United States v. Scharon*, 187 F.3d 17, 23 (1st Cir.1999); *United States v. Yate*, 176 F.3d 1309, 1310 (11th Cir.1999); *United States v. Sabir*, 117 F.3d 750, 753 (3d Cir.1997); *United States v. Gambino*, 106 F.3d 1105, 1111 (2d Cir.1997); *United States v. Adu*, 82 F.3d

119, 124–25 (6th Cir.1996). The scope of the third safety valve interview was not overly broad.

B. The Materiality Of Ramirez's Inconsistent Statements.

Ramirez also contends that the district court improperly based it's determination on immaterial inconsistencies and ignored that she told the government "all she knew" about Rodriguez, Juan Carlos, Gustavo, Morciglio, and the gas-station transfer. Ramirez highlights only one specific example of how she believes the district court got lost in minutiae–that she "inadvertently" identified "Wilson" (who gave her the money for the gas-station transfer) as "William" during the sentencing hearing.

As an initial matter, the record does not support Ramirez's claim that the Wilson/William inconsistency was an innocent mistake. The district court gave Ramirez the opportunity to consult with her counsel specifically about this discrepancy and to correct the record if need be, and Ramirez declined:

THE COURT: There is some discrepancy about the name that she provided on an earlier occasion,—

MR. LOPEZ: That's right.

THE COURT: —Wilson versus William,—

MR. LOPEZ: Right.

THE COURT: —so let me ask the court interpreter if it's possible that the defendant said "Wilson" when the court interpreter interpreted the name as "William."

DEFENDANT RAMIREZ: No, Judge.

(Sentencing Transcript, R. 55–1 at p. 33.)

Moreover, the district court did not get lost in minutiae; its finding was based on its belief that Ramirez was not credible considering the totality of her statements.

As the Supreme Court has noted, such credibility determinations "can virtually never be clear error," *see Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), and we will defer to them unless they lack any support in the record, *see United States v. Akinrinade*, 61 F.3d 1279, 1289 (7th Cir.1995). Here, the record supports the district court's conclusion–it is replete with inconsistent claims by Ramirez, including the following examples:

· During the third safety valve interview, Ramirez claimed that none of the calls on the drug phone records were drug-related. That claim is inconsistent with Ramirez's claim during the sentencing hearing that, on the day she went to the Edgebrook Motel, when her phone rang she knew that she would be asked to pick up drugs or drug money.

· Ramirez's post-arrest admission that the drug phone was used in connection with drug trafficking is inconsistent with her claim during the third safety valve interview that none of the calls to or from the drug phone were drug-related.

· Ramirez's post-arrest claim that an unknown male bought the drug phone for her is inconsistent with her claim during the first two safety valve interviews that Desaree Morciglio bought the phone.

· Ramirez claimed during the third safety valve interview that the Philadelphia phone number listed in her phone records belonged to a girlfriend who was a dancer. The DEA later determined that the number was the same number provided to law enforcement by an individual arrested on cocaine and money laundering charges.

· Ramirez's post-arrest claim that she met Desaree Morciglio in a nightclub

after Ramirez arrived in Chicago is inconsistent with her claim during the first two safety valve interviews that she had known Morciglio since 1998. Ramirez's claim during her first two safety valve interviews that she was never paid for drug trafficking is inconsistent with (1) her post-arrest confession that she started trafficking because Carlos said she could "make money," and (2) the fact that she was able to afford an apartment and a car, and possessed a large amount of cash so soon after arriving in Chicago in April 2000 (and, for that matter, the United States in March 2000).

The district court's credibility determination is well-grounded in the record, and we will not disturb it.

AFFIRMED