**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Eleazar ESPINOZA, Defendant–
Appellant.**

No. 01–2469.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 30, 2002.
Decided Feb. 26, 2002.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

### ORDER

Eleazar Espinoza pleaded guilty to possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and was sentenced to twenty years' imprisonment. On appeal he maintains that the district court erred in finding him ineligible for a "safety valve" exception to the statutory minimum sentence. 18 U.S.C. § 3553(f); *see also* U.S.S.G. § 5C1.2. We affirm.

In November 2000 Espinoza was riding in a tractor-trailer cab driven by codefendant Jose Martin Alvarado when they were stopped by an Illinois police officer for speeding. While he was questioning Alvarado, the officer became suspicious that the defendants were transporting drugs. With Alvarado's consent the officer proceeded to search the truck and found several bundles of cocaine under the sleeper compartment.

Espinoza and Alvarado were arrested and taken to Illinois police headquarters for separate questioning. According to the police report, Espinoza told the reporting officer, Sergeant L.H. Parker, that about two to three weeks before their arrest he and Alvarado had been introduced to a person named Miguel Vallejo by a Rick Maron of McAllen, Texas. The purpose of the introduction was for Espinoza and Alvarado to obtain a trucking job from Vallejo. Subsequently, Vallejo contacted Espinoza and offered him a job driving a truck to Chicago. Espinoza picked up the truck at Vallejo's residence the same morning and was then instructed to go to a Walmart store located in Houston, Texas. There, Espinoza and Alvarado were met by an unidentified Hispanic male who handed Alvarado two duffel bags containing what Espinoza knew to be narcotics.

Espinoza expected to be paid $5000 for the trip.

According to Parker's report, Espinoza's cell phone, which was equipped with caller I.D., rang "throughout" the interview. Parker asked Espinoza if he would be willing to answer the phone in an attempt to elicit information from the callers, and Espinoza agreed. Parker documented the numbers of four of these calls. The first caller was a female who referred to herself as "Claudia." Espinoza told "Claudia" that he did not know her. "Claudia" then asked Espinoza whether they were still going out that night, and Espinoza again said that he did not know who she was. When the phone rang again, Parker told Espinoza to say that he was having phone trouble and that he would call back. Upon answering, Espinoza spoke in English and Spanish. He then said that he was having phone trouble, and the call was terminated. The police report offers no information regarding the third call, and as to the last, the report states only that a female caller asked Espinoza if he could talk.

In December 2000 Espinoza, with his attorney, attended a proffer meeting conducted by DEA agent Brian Latham. According to Latham's report, Espinoza claimed during the proffer that he had no prior involvement with transporting drugs. When confronted with reports that he and his brother had been arrested in June 1995 with approximately 180 pounds of marijuana and three grams of cocaine, Espinoza stated that the marijuana was his brother's. Espinoza, meanwhile, had pleaded guilty only to simple possession of the cocaine and had received a suspended sentence.

When Latham questioned him about the details of his November 2000 arrest, Espinoza provided substantially the same information that he had offered earlier to Parker: that he and Alvarado had been in-

troduced to Vallejo by Maron; that two weeks later Vallejo offered him a job driving a truck to Chicago; and that Vallejo instructed him to go to a Walmart store where an unidentified Hispanic male gave Espinoza and Alvarado two duffel bags containing what Espinoza believed to be drugs. Espinoza further stated that it was not until he reached Oklahoma that he realized that Vallejo, accompanied by an unknown female and a person known as "Rudy," was following him in a "trail" car.

Latham also asked Espinoza whether he had discussed his arrest with any of his cellmates. Espinoza denied doing so but could provide no explanation as to how his cellmates knew about the details of the arrest. Lastly, in response to questions about the phone calls he received during his earlier interview with Parker, Espinoza admitted that, although he had agreed to cooperate during those calls, he did not do so. Specifically, Espinoza admitted that he had covertly instructed one of the callers that he had been arrested.

Unsatisfied with the proffer, the government informed Espinoza that it was not accepted. Espinoza did not request or attempt a second proffer.

At sentencing both parties presented testimony regarding whether Espinoza's safety-valve proffer had been fully forthcoming and truthful. Espinoza, testifying on his own behalf, stated that he did not know anyone other than Vallejo and Maron who was involved in drug trafficking. He identified the occupants in the trail car as Vallejo, a man "they call Rudy I think," and an unknown female. He stated that he did not know who "Claudia" was, or whether she was the woman in the trail car, and denied admitting at his proffer that he did not cooperate during one of the calls he had received during his interview with Parker. According to Espinoza, that call was from "some girl I didn't know who

she was. She started asking me about if I was okay and I said, well, who is this. I didn't know who it was. So I never gave her any information and she hung up.... She kept telling me was I okay. I said who is this. I think she said some name, Laura or something, and I said I don't know who you are."

Espinoza also testified that he had no prior involvement in transporting drugs. He claimed no knowledge of the marijuana his brother was caught trafficking in 1995 and pointed out that he was never charged with any offense in relation to its transport. Further, he testified that he never told his cellmates that he had made any prior drug runs. Espinoza admitted, however, talking to his cellmates about how much imprisonment time he was going to get for his offense.

The government's first witness was DEA agent Latham, who testified that he believed Espinoza was not being truthful from the start of the proffer because he answered no to the first question asked, i.e., whether he "had ever been involved with transporting drugs in the past." Latham further testified that during the proffer Espinoza denied having discussed his November 2000 arrest with his cellmates, even when confronted with the fact that they knew intimate details about the arrest. Also according to Latham's testimony, Espinoza admitted during the proffer that he had covertly informed the unidentified female caller that he had been arrested.

The government next offered the testimony of Espinoza's cellmates, Joe Morris and Fred Skelton. Both of those witnesses stated that they had heard Espinoza talking about his November 2000 arrest and that he had admitted to transporting drugs on prior occasions.

After hearing all the testimony, the district court found that Espinoza did not completely and truthfully provide all the evidence and information he had concerning his offense. In making its determination, the court stated that it looked to the credibility of the witnesses, specifically watching their manner, eye contact, body language, ability to field questions, and responsiveness. The court then noted that some of Espinoza's testimony was inconsistent, both internally and with the police reports, in at least three regards:

You [Espinoza] denied on this witness stand knowing the person who called you on the cell phone. You said her name was Claudia or something like that. You actually thought she had the wrong number. When I listened to the testimony of the officer and I reviewed your proffer summary, it appears clear to me that you were trying to prevent the Government from knowing who that person was on the phone, that you were trying to keep their identity secreted. Next, you denied any prior narcotics transportation, and I understand your testimony in your view of the story was when you were asked about that, you were not the one who had the 180 pounds of marijuana, it was really your brother back in '95, and you had 3 grams of cocaine. I think the questions that you were asked about prior narcotics transportation were broad enough that you should have mentioned that to the officers. I think that was, on your part, an intentional nondisclosure. You expressly denied speaking to any cellmates about this case according to the proffer that you gave on November 14th. [″]Espinoza denies ever having the conversation with any of his cellmates regarding the arrest. Espinoza has no explanation as to how his cellmates knew the details of his arrest.[″] So I think there is lack of candor and forthrightness in that statement by you

irrespective of whether or not the individuals from the jail can be believed or not. The fact of the matter is that there were conversations with those individuals.

Based on the totality of the circumstances, the district court concluded that Espinoza "did not make a good faith attempt to cooperate with the authorities" and denied his motion for relief under the safety valve. The court emphasized that in reaching its decision it gave very little, if any, weight to the testimony of Morris and Skelton. The court then sentenced Espinoza to the statutory minimum sentence of 240 months. 21 U.S.C. § 841(b)(1)(A). (Before Espinoza entered his plea, the government had filed an information charging a prior felony drug offense. *See id.* § 851(a).)

At the threshold we must address the government's argument that this court lacks jurisdiction to hear the appeal. Specifically, the government contends that the district court abused its discretion in granting Espinoza's motion to extend the time to appeal because Espinoza failed to show "excusable neglect." *See* Fed. R.App. P. 4(b)(4). But after reviewing the record, we agree with the district court that there was excusable neglect for the late appeal. We shall therefore proceed to the merits.

 To be eligible for a safety-valve exception to a statutory minimum sentence, defendants must meet five requirements. *See* 18 U.S.C. § 3553(f). Only the fifth is at issue here: whether, not later than the time of sentencing, Espinoza "truthfully provided to the Government all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." *Id.* § 3553(f)(5). It was Espinoza's burden to prove by a preponderance of the evidence that he was entitled to the benefit of the safety valve.

*United States v. Ramirez,* 94 F.3d 1095, 1101 (7th Cir.1996). We review the district court's findings only for clear error. *United States v. Galbraith,* 200 F.3d 1006, 1016 (7th Cir.2000).

As already mentioned, the district court made three specific findings in support of its general determination that Espinoza did not fully cooperate with the government: (1) Espinoza secreted the identity of the female caller; (2) he intentionally withheld information regarding his 1995 arrest; and (3) he lied about whether he had discussed his offense with his cellmates. Espinoza maintains that these latter two findings are irrelevant to whether he is eligible for the safety valve. Specifically, he argues that he was not required to divulge information regarding his 1995 arrest or the comments he made to his cellmates because those incidents were "not part of the same course of conduct or of a common scheme or plan" as the offense of conviction. 18 U.S.C. § 3553(f)(5). Though it is hard to tell from this record, Espinoza may be correct that neither of those two incidents is sufficiently related to the offense of conviction to be deemed relevant conduct under U.S.S.G. § 1B1.3. *See* U.S.S.G. § 1B1.3, comment. (n.9) (outlining factors that support finding of common scheme or plan or same course of conduct); *see also id.* § 5C1.2, comment. (n.3) (for purposes of safety-valve provisions, "offense or offenses that were part of the same course of conduct or of a common scheme or plan" means the offense of conviction and all relevant conduct). The government in fact concedes this point in its brief. And if Espinoza is right, then the district court erred to the extent it relied on its findings regarding those incidents as independent reasons why Espinoza was not entitled to the safety valve. *See United States v. Miller,* 179 F.3d 961 (5th Cir.1999) (safety-valve provisions applied despite defendant's admitted untruthfulness regarding prior drug activities; defendant was not required to provide information about those activities because they did not qualify as part of the same course of conduct or common scheme or plan as offense of conviction).

But none of this is of any consequence. The district court did not clearly err in finding that Espinoza secreted the identity of the female caller, and that finding alone is enough to support the court's decision. *See United States v. Scharon,* 187 F.3d 17, 23–24 (1st Cir.1999) (denial of safety valve appropriate where defendant failed to disclose identity of drug supplier); *United States v. Gambino,* 106 F.3d 1105, 1110 (2d Cir.1997) (same). Although Espinoza testified (and reasserts on appeal) that he did not know the identity of the caller, the district court found his testimony "troubling" and chose not to believe it. We give special deference to a district court's credibility findings, which can virtually never be clear error. *United States v. Pedroza,* 269 F.3d 821, 826 (7th Cir.2001); *United States v. Thompson,* 106 F.3d 794, 800 (7th Cir. 1997); *Ramirez,* 94 F.3d at 1102. Here, given the number of inconsistencies in Espinoza's story, the district court had sound reasons for discrediting it; accordingly, we conclude that the court did not clearly err in denying safety-valve relief. *See United States v. Rodriguez,* 69 F.3d 136, 143–44 (7th Cir.1995) (affirming denial of safety valve where district court's credibility determinations led to finding that defendant had not divulged all information he had concerning his offense).

■ Espinoza's last-ditch argument is that it was disparate treatment for the district court to deny him the benefit of the safety valve while awarding it to Alvarado. Citing *United States v. Flanagan,* 80 F.3d 143 (5th Cir.1996), Espinoza contends that a sentencing court can consider the relative culpability of codefendants in determining whether the safety valve should apply. That much is true where

the *fourth* requirement of the safety-valve provision–defendant cannot be an "organizer, leader, manager, or supervisor of others in the offense," 18 U.S.C. § 3553(f)(4)–is in question. *Flanagan*, 80 F.3d at 147–48. In that context it makes perfect sense for the sentencing court to consider the relative *culpability* of the defendants. *Flanagan* does not, however, support Espinoza's position that, where co-defendants "gave virtually all of the same information to the authorities regarding their offense, the surrounding circumstances and their accomplices," it is error for the sentencing court to award one the benefit of the safety valve but not the other. Whether Espinoza and Alvarado gave the same information is not the pertinent question; Espinoza simply might have had more information to give. That Alvarado was found eligible for the safety valve is therefore irrelevant to Espinoza's case.

AFFIRMED.